IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESSOTA

| | | |
|---|---|---|
| LISA MARIE BENEDICT, | * | |
| | * | |
| Plaintiff, | * | 0:19-cv-03188 RWP |
| | * | |
| v. | * | |
| | * | |
| ANDREW SAUL, | * | |
| Commissioner of Social Security, | * | |
| | * | MEMORANDUM OPINION |
| Defendant. | * | AND ORDER |
| | * | |

Plaintiff, Lisa Marie Benedict, filed a Complaint in this Court on December 27, 2019,

seeking review of the Commissioner's decision to deny her claim for Social Security benefits

under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. and 1381 *et seq*.

This Court may review a final decision by the Commissioner.  42 U.S.C. § 405(g).

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security

Income Benefits on March 24, 2016.  Tr. at 250-59.  Plaintiff appeared at an administrative

hearing on February 13, 2019, before Administrative Law Judge Virginia Kuhn (ALJ).  Tr. at 49-

85. The ALJ issued a Notice of Decision – Unfavorable on April 15, 2019.  Tr. at 7-37.  On

November 8, 2019, the Appeals Council declined to review the ALJ's decision[1].  Tr. at 1-3.

Thereafter, Plaintiff commenced this action.  Both parties filed Motions for Summary Judgment

and memorandum in support thereof.  ECF Nos. 17, 18, 28 (reply) & 26, 27.

**ALJ's DECISION**

At the outset of the decision, the ALJ noted that Plaintiff is insured for benefits until June

---

[1] The Appeals Council declined to review the ALJ's decision on August 11, 2019 (Tr. 4-9).
After new evidence was received, the Appeals Council reopened the case, but found no
reason to change the decision.

30, 2015.  At the first step of the sequential evaluation, 20 C.F.R. § 404.1520(a)(4) &

416.920(a)(4), the ALJ found that Plaintiff has not engaged in substantial gainful activity after

May 6, 2014, the alleged disability onset date.  Tr. at 13.

At the second step, the ALJ found Plaintiff has the following severe impairments:  hearing

loss with bilateral BAHA[2] implantation; obesity; degenerative disc disease of the spine;

tenosynovitis arthritis in both thumbs; headaches; and bilateral shoulder impingement syndrome.

Tr. at 13-14.

In addition to severe impairments, the ALJ found that Plaintiff has medically determinable

impairments which are not severe, i.e. the following impairments do not cause more than minimal

work-related restrictions:  1) feet -- hallux medial border permanent removal, right fifth toe callus,

lapidus bunionectomy and partial nail matrixectomy of the right great toe in early 2017, lapidus

bunionectomy of the left foot and excision of soft tissue mass in November 2018; 2) complaints

of excess sleepiness or hypersomnia; 3) perforated ulcer; 4) exploratory laparoscopy with

laparoscopic repair of perforated ulcer in August 2017; 5) mental impairments consisting of

depression and anxiety disorder, adjustment reaction with anxious mood, pain disorder associated

with psychological factors.  Tr. at 14-19.

The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits

at the third step of the sequential evaluation.  Tr. at 19.

At the fourth step, the ALJ found:

After careful consideration of the entire record, the undersigned finds the claimant has
the residual functional capacity to perform sedentary work as defined in 20 CFR
4041567(a) and 416.967(a) except:  occasional climbing of ramps and stairs; no
climbing of ladders, ropes or scaffolds; no work at unprotected heights or with hazards
or hazardous machinery, and within this also there would be no balancing as if one
were at heights or needing to walk across a narrow plank; frequent but not constant
handling, but no power gripping, power grasping, or torqueing activities with the

---

[2] bone anchored hearing aid.  *Lipp v. Colvin*, 2014 WL 988474 at *4 (E.D. Missouri 2014).

hands bilaterally; no overhead reaching; occasional stooping and crouching; no kneeling, no crawling; and a work environment that would be defined as moderate for the noise level in the work environment as set forth in the Selected Characteristics of Occupations companion to the Dictionary of Occupational Titles.

Tr. at 21.  The ALJ found that Plaintiff is unable to perform any of her past relevant work.  Tr. at 34.  Based on the testimony of a vocational expert, the ALJ found that there are a significant number of jobs in the national economy which Plaintiff can perform, examples of which are surveillance system monitor, charge account clerk and, information clerk.  Tr. at 35.  The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 36-37.

## STANDARD OF REVIEW

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'"  *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2007) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)).  The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact."  *Id*. (quoting *Nicola*, 480 F.3d at 886).  Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

*Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (alterations in original).

In *Brand v. Sec'y of Dep't of Health, Educ. and Welfare*, 623 F.2d 523, 527 (8th Cir. 1980), Chief Judge Lay wrote that *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951), is "the guideline for the evaluation of the standard of review."  In *Universal Camera*, the Court wrote:

We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the

conventional judicial function.  Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals.  The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

340 U.S. at 490.  In *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) the Court wrote: "On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence'.  The Court continued:

> And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is "more than a mere scintilla." It means – and means only – "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

139 S. Ct. at 1153 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). In reviewing disability decisions from the Social Security Administration, this Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole.  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). In *Gavin*, the Court wrote:

> In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory. It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out.

*Id*. (citations omitted).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record.  *Wilcutts v. Apfel*, 143 F.3d 1134, 1136-37 (8th Cir. 1998) (citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975)).

The most important issue in any disability case that proceeds beyond step three of the sequential evaluation is that of residual functional capacity:

> Probably the most important issue will be the question of [residual functional capacity] . . . The RFC that must be found . . . is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.

*McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).

For reversal Plaintiff argues: (1) the ALJ did not reasonably conclude Plaintiff's mental impairment would have no effect on her ability to work; and, (2) the ALJ's findings regarding Plaintiff's physical impairments are contrary to the law based upon improper rejection of the treating pain specialist's opinion.  ECF #18 p. 1.

### ISSUE I:  DID THE ALJ ERR IN BY FINDING THAT PLAINTIFF'S MENTAL IMPAIRMENTS ARE NOT SEVERE?

Plaintiff begins this argument by asserting that the ALJ's finding that Plaintiff's mental impairments are not severe is based on "purported 'intermittent' treatment and 'normal' affect and mood as support."  Plaintiff then goes on to assert that the ALJ's conclusions are contradicted by mental health records and the opinions of a treating provider and the opinion of a State agency psychological consultants.

### DONALD UHLHORN, BS, MSW. LICSW

Plaintiff cites the opinion rendered by Donald Uhlhorn, BS, MSW, LICSW.  ECF #18, page 7.  On January 24, 2017, Mr. Uhlhorn wrote to Plaintiff's representative stating that Plaintiff's medical conditions contribute to her mental health symptoms, and that her pain contributes to her

fatigue.  Mr. Uhlhorn opined that it would be dangerous for Plaintiff to operate machinery because she cannot use her thumbs.  He observed that Plaintiff wears a hearing device that dangles from her neck.  Because of a history of alcohol problems, Mr. Uhlhorn opined that Plaintiff is not able to manage her own benefits.  Mr. Uhlhorn concluded by observing that while Plaintiff would like to be employed, she is unable to sustain the daily activities associated with work.  Tr. at 1435.  Mr. Uhlhorn also completed a check-the-box medical source statement.  When asked to identify diagnoses, Mr. Uhlhorn wrote diagnostic codes, with no accompanying explanation.  When asked to describe treatment and response, Mr. Uhlhorn wrote: "Fatigue – tendency to fall asleep inability to sustain concentration, memory.  Frustration, anger – anxiety – depression."  Tr. at 1436.  On a form which asked Mr. Uhlhorn to rate Plaintiff's limitations on a scale of none or mild, moderate, marked, extreme, Mr. Uhlhorn indicated "extreme" limitations on 8 of the domains, "marked" on 5 domains, "moderate" on 3 domains, and "none or mild" on 5 domains.  When asked to identify any documentation deficiencies where objective testing would further explain the patient's limitations, Mr. Uhlhorn wrote: "Pain & hearing loss – anxiety see medical record."  Tr. at 1437.  Mr. Uhlhorn opined that Plaintiff needs unscheduled breaks because: "appears use of hands is a problem due to pain – not able to perform tasks at all."  Mr. Uhlhorn opined that Plaintiff would miss more than three days per month and would be absent from work more than three days per month.  When asked to identify any additional limitations, Mr. Uhlhorn wrote: "pain creates anxiety – client more likely than not has permanent condition."  Tr. at 1438.  Mr. Uhlhorn reported that Plaintiff has had two treatments for alcoholism and was in out-patient treatment with almost 5 months of sobriety.  Tr. at 1439.

At step four of the sequential evaluation, the ALJ considered Mr. Uhlhorn's opinion and gave the following reasons for giving the opinion little weight:  1) Mr. Uhlhorn opined that Plaintiff is unable to use her thumbs, but Plaintiff is able to do homework, write papers and

perform personal care[3]; 2) Mr. Uhlhorn is not a physician; 3) Mr. Uhlhorn is not qualified to discuss Plaintiff's physical limitations; 4) Mr. Uhlhorn's statement that Plaintiff has fatigue, inability to sustain concentration and memory, are contradicted by the claimant's numerous benign mental status examinations found in the record; 5) there are no findings by treating providers observing abnormal concentration or attention; 6) Mr. Uhlhorn's statement is inconsistent with treatment records, and objective findings. The ALJ pointed to numerous notations in the medical record in which various treating sources note benign mental status examinations with no findings by treating physicians of abnormal concentration or attention. Tr. at 33. The citations noted by the ALJ are[4]:

1. On November 10, 2015, Plaintiff was seen by Olutoyin Enitan Akintola, M.D. for a pre-op-evaluation in anticipation of a left BAHA implantable hearing aid placement scheduled for November 13, 2015. Tr. at 438. On Exam, **mentation appeared normal and affect normal/bright**. Tr. at 442.
2. On September 9, 2014, Plaintiff was seen at the emergency department complaining of nausea with vomiting and dizziness and giddiness. Tr. at 647. On examination, Plaintiff was noted to have **a normal mood and affect**. Tr. at 651.
3. On February 2, 2015, Plaintiff was seen by John Benjamin Buren, DPM for an ingrown right big toenail. Tr. at 686. On exam, Plaintiff's **affect was pleasant and appropriate**, and she appeared motivated to improve her health. Tr. at 690.
4. On June 2, 2015, Plaintiff was seen by Dr. Akintola for a preop general physical examination. Tr. at 707. Plaintiff's sensory exam was grossly normal, **her mentation was intact, and her speech was normal**. Tr. at 712.
5. On October 7, 2015, Plaintiff's saw Sarah Kinsella, M.D. for bilateral thumb pain. Tr. at 743. Plaintiff's **mentation appeared normal and her affect was normal/bright.** Tr. at 746.
6. On October 12, 2015, Plaintiff saw Taylor Anne Hastings, PA-C. for impingement syndrome of both shoulders and for low back pain without sciatica. Tr. at 750. Plaintiff's **mentation appeared normal and her affect**

---

[3] Elsewhere in the record, it was established that during the pendency of this application, Plaintiff has earned a college degree. See. e.g., Tr. at 32 where the ALJ noted that Plaintiff testified that she had finished her degree in criminal justice in November 2018 and stopped working in an administrative position when she graduated.)

[4] Throughout this opinion the Court will focus attention on the medical evidence cited by the parties. Nothing would be added by summarizing each of the nearly 3000 pages (2,647 to be precise) of medical records.

**was normal/bright**.  Tr. at 751.

7. On November 10, 2015, Plaintiff saw Dr. Akintola for a preop general physical exam and for chronic allergic conjunctivitis.  Tr. at 753.  Plaintiff **mentation appeared normal and her affect was normal/bright**.  Tr. at 759.

8. On November 11, 2015, Plaintiff saw Julia L. Montejo, M.D. for chronic rhinitis, dry eyes, and rhinorrhea.  Tr. at 761.  Plaintiff **mood and affect were noted to be normal**.  Tr. at 763.

9. On July 22, 2015, Plaintiff presented for inpatient alcohol treatment in the next few weeks.  Tr. at 1351.  Plaintiff was noted to be **alert, pleasant, in no apparent distress, and oriented**.  Tr. at 1354.

10. On February 6, 2017, Plaintiff was seen at Interventional pain physicians, for follow-up evaluation of chronic neck pain, migraines, and bilateral hip pain.  On examination, Plaintiff was noted to be **alert and oriented x3, with a normal mood and affect**.  Tr. at 1444.

11. On March 20, 2017, Plaintiff saw Ronald Blair Boeding, M.D. for "thoracic access and cervical placement of SCS trial leads – Boston Scientific."  Plaintiff's **mentation appeared normal, affect was anxious and she had good eye contact**.  Tr. at 1493.

12. On October 6, 2016, when see at Radioloby Injection Office for a cervical spine injection.  Plaintiff's **mentation appeared to be normal with a full affect** and good eye contact.  Tr. at 2016.

13. On December 6, 2016, Plaintiff was seen for sleep problems – excessive daytime sleepiness and periodic limb movement disorder.  Tr. at 2065.  Plaintiff's **mentation appeared normal and her affect was normal/bright**.  Tr. at 2076.

14. On December 16, 2016, Plaintiff saw Dr. Akintola for a preop general physical examination.  Tr. at 2079.  Plaintiff was noted to have **normal mentation and her affect was normal/bright**.  Tr. at 2088.

15. On March 20, 2017, on a gastric bypass preoperative examination, Plaintiff was noted to have **normal mentation and her affect was normal/bright**.  Tr. at 2156.

16. On April 18, 2017, Plaintiff saw Teresa Gray, M.D. regarding a weight loss program.  Diagnoses included **major depressive disorder, recurrent episode**, **mild**.  Plaintiff was to continue her current regimen of medication.  Tr. at 2196.

17. On July 11, 2017, Plaintiff's **mentation appeared to be normal and her affect was normal/bright** (Tr. at 2282) when she was seen by Steven J. Thompson, M.D. for assessment of chronic low back pain.  Tr. at 2277.

Bold emphasis added.

## STATE AGENCY PSYCHOLOGICAL CONSULTANTS
### AMY S. JOHNSON, Ph.D.

Plaintiff argues that the opinions of the State Agency psychological consultants detract from

the ALJ's findings.

On July 25, 2016, at the initial level of administrative review, State agency psychological consultant Amy S. Johnson, Ph.D. evaluated Plaintiff's medically determinable mental impairments – affective disorders and anxiety disorders – using the Psychiatric Review Technique form. Dr. Johnson rated the "B" criteria of the listings of impairments as mild or none: Restriction of activities of daily living – mild; Difficulties maintaining social functioning – mild; difficulties maintaining concentration, persistence or pace – mild; Episodes of decompensation – none. Tr. at 97-98. Dr. Johnson wrote that the mental impairment was non severe for the title II period. Tr. at 98. Dr. Johnson opined that for the period from March 24, 2016 (the date of application for Supplemental Security Income benefits) to the present, two of the "B" criteria were rated as moderate – difficulties maintaining social functioning, and difficulties maintaining concentration, persistence or pace. Tr. at 99. On a mental residual functional capacity form, Dr. Johnson made the following determinations regarding the period beginning March 24, 2016 (answers are in bold type):

1) Does the individual have understanding and memory limitations – **Yes**
2) the ability to remember locations and work-like procedures – **not significantly limited**
**3)** the ability to understand and remember very short and simple instructions – **not significantly limited**
4) the ability to understand and remember detailed instructions – **moderately limited**
5) does the individual have sustained concentration and persistence limitation – **Yes**
6) the ability to carry out very short and simple instructions – **not significantly limited**
7) the ability to carry out detailed instructions – **moderately limited**
**8)** the ability to maintain attention and concentration for extended periods – **not significantly limited**
**9)** the ability to sustain an ordinary routine without special supervision – **not significantly limited**
10) the ability to work in coordination with or in proximity to others without being distracted by them – **moderately limited**
11) the ability to make simple work-related decision – **not significantly limited**
12) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods – **moderately limited**
13) does the individual have social interaction limitations – **yes**
14) the ability to interact appropriately with the general public – **moderately limited**
15) the ability to ask simple questions or request assistance – **not significantly limited**

16)     the ability to accept instruction and respond appropriately to criticism from supervisors—**not significantly limited**

17)     the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes – **not significantly limited**

18)     the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness – **not significantly limited**

19)     Does the individual have adaption limitations – **yes**

20)     the ability to respond appropriately to changes in the work setting – **moderately limited**

**21)**     the ability to be aware of normal hazards and take appropriate precautions – **not significantly limited**

**22)**     the ability to travel in unfamiliar places or use public transportation – **not significantly limited**

**23)**     the ability to set realistic goals or make plans independently of others – **not significantly limited**

Tr. at 103-04.  Bold emphasis added.  Dr. Johnson opined that Plaintiff retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions but would be markedly impaired for detailed or complex/technical instructions.  Likewise, in other areas of functioning, the psychologist opined that Plaintiff is unable to handle detailed or complex tasks but able to engage in more simple uncomplicated activity.  Tr. at 104.

JANIS L. KONKE, M.S., L.P.

On April 18, 2017, at the reconsideration stage the claim was evaluated by State agency psychological consultant Janis L. Konke, M.S., L.P.  For the period between May 6, 2014 and June 30, 2015 (the date Plaintiff was last insured for Title II benefits), Ms. Konke rated the "B" criteria as:  Understand, remember or apply information – mild; Interact with others – mild; concentrate, persist or maintain pace – mild; adapt or manage oneself – mild.  Ms. Konke concluded the evidence suggests a severe mental impairment that does not meet or equal listing level.  Ms. Konke then proceeded to evaluate Plaintiff's residual functional capacity.  Tr. at 138.

Ms. Konke wrote that the following mental residual functional capacity assessment was for the period beging March 24, 2016.  Her responses to the inquiry are in bold type:

1)      Does the individual have understanding and memory limitations? – **No**;
2)      Does the individual have sustained concentration and persistence limitations? – **Yes**
3)      The ability to carry out very short and simple instructions – **Not significantly limited**
4)      the ability to carry out detailed instruction – **Moderately limited**
**5)**      The ability to maintain attention and concentration for extended periods – **Not significantly limited**
6)      The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances – **Moderately limited**
**7)**      The ability to sustain an ordinary routine without special supervision – **Not significantly limited**
8)      The ability to work in coordination with or in proximity to others without being distracted by them – **Moderately limited**
9)      The ability to make simple work-related decisions – **Not significantly limited**
10)    The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods – **Moderately limited**
11)    Explain in narrative form the sustained concentration and persistence capacities and/or limitations – **She retains the ability to concentrate and attend to 3-4 step tasks.  She would have moderate limitations for detailed, complex and technical tasks**
12)     The ability to interact appropriately with the general public – **moderately limited**
13)    The ability to ask simple questions or request assistance – **Not significantly limited**
14)    The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes – **not significantly limited**
15)    The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness – **Not significantly limited**
**16)**    Explain in narrative form the social interaction capacities and/or limitations – **She retains the ability to tolerate superficial interactions with coworkers, Supervisors.  She would do best without public contacts.  In this context she can tolerate ordinary levels of supervision**
17)    The ability to respond appropriately to changes in the work setting – **Moderately limited**
**18)**    The ability to be aware of normal hazards and take appropriate precautions – **Not significantly limited**
**19)**    The ability to travel in unfamiliar places or use public transpiration – **Not significantly limited**
**20)**    The ability to set realistic goals or make plans independently of others – **Not significantly limited**
**21)**    Explain in narrative form the adaptation capacities and/or limitations – **stress tolerance is reduced however she retains the ability to tolerate routine changes in the work environment**

Tr. at 142-44.  Ms. Konke wrote: "Claimant's ability to handle stress and pressure in the work

place would be reduced but adequate to handle the stresses of a routine repetitive or a 3-4 step

work setting.  It would not be adequate for the stresses of a detailed or complex work setting."

Tr. at 144.

        The ALJ considered the opinions of the State agency psychological consultants.  Tr. at 18.

The ALJ wrote:

> Overall, the state agency consultants' conclusion that the claimant's mental health impairments and symptoms do not result in more than minimal work-related restriction are consistent with the overall evidence presented at the hearing level regarding the claimant's mental health impairments, discussed in detail above. Therefore, their conclusions are given great weight in finding the claimant's mental health impairments are non-severe.  Further, the state agency consultants are experts in mental health and have specialized knowledge evaluating mental health impairments under the standard set forth in the regulations, and they reviewed much of the evidence presented.

Tr. at 18-19.

## COMMISSIONER'S ARGUMENT

The Commissioner argues that the ALJ followed the procedures set forth in the regulations for the evaluation of mental impairments at step two of the sequential evaluation.  The Commissioner writes: "Despite the regulation clearly defining how the Commissioner analyzes mental impairments in a disability claim, Plaintiff's argument challenging the ALJ's non-severe finding does not specify what phase of the ALJ's special technique analysis she contends is lacking."  ECF #27 at 9.  The Commissioner contends that Plaintiff is asking the Court to reweigh the evidence – an invitation the Court should decline.  *Id*.

Regarding the opinion evidence, the Commissioner argues that the ALJ considered Mr. Uhlhorn's opinion but was not required to adopt it.  *Id*. at 14.  Regarding the State agency consultants' opinions, the Commissioner argues that the ALJ was not required to adopt any prior administrative findings.

The Commissioner concludes his argument by asserting that because the ALJ found Plaintiff had no more than mild restrictions in each of the four "paragraph B" criteria, the ALJ's conclusions supported a finding that Plaintiff's mental impairments were not severe and that the Court should affirm the Commissioner's final decision rather than reweighing the evidence.  *Id*. at 27.

DISCUSSION OF ISSUE I

As the Commissioner points out, in making the step two finding, the ALJ is required by the regulations to analyze the mental impairment(s) using the special technique for the evaluation of such impairments.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  The Court agrees with the Commissioner that the ALJ followed the proper procedures and properly considered the opinions of Mr. Uhlhorn and the State agency consultants.  As the Commissioner points out, Plaintiff has not pointed to any fault in the ALJ's application of the special technique used at step two when evaluating the severity of mental impairments.  Nor, does the Court find any fault in this regard.  Likewise, the opinions of the three experts do not detract in any way from the conclusion reached by the ALJ.  Although Dr. Johnson and Ms. Konke found Plaintiff's mental impairments to be severe, they also opined that Plaintiff retains the residual functional capacity for unskilled work – which is what the ALJ found.

Finally, even if it there was error in the finding that Plaintiff's mental impairments are not severe, that error is harmless.  "Courts frequently find that an ALJ's error at Step Two in failing to find a particular impairment severe does not require reversal where the ALJ finds other severe impairments and considers all of a claimant's impairments, severe and non-severe, in his or her subsequent analysis."  *Cornick v. Berryhill*, No. 4:17-CV-1265-SPM, 2018 WL 4383300 at *4 (E.D. Mo. Sept. 14, 2018).  In *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019), the Court wrote: "Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless."  Here, the ALJ found severe impairments and proceeded through the steps of the sequential evaluation.  As the ALJ noted, when the claimed effects of Plaintiff's mental impairments were considered by the vocational expert, the expert testified that the identified jobs could still be performed.  All of the jobs which the ALJ found Plaintiff is able to perform are unskilled, i.e. the jobs involve simple, routine, repetitive work that

can be learned in 30 days or less.  The Court finds no error on this issue.

### ISSUE II:  DID THE ALJ PROPERLY EVALUATE PLAINTIFF'S PHYSICAL IMPAIRMENTS AND THE OPINION OF HER TREATING PHYSICIAN.

On November 15, 2016, Ron Boeding, M.D., submitted a medical source statement.  Tr. at 1401-06.  The form is a "check-the-box" with some brief hand-written answers.   The ALJ summarized the contents of the form in her decision:

> Ron Boeding, MD, completed a medical source statement regarding the claimant dated in November 2016, where he indicated the claimant could lift up to 10 pounds occasionally and less than 10 pounds frequently, stand and walk about three hours during an eight-hour workday and sit about three hours during an eight-hour workday. He indicated the claimant could sit 30 minutes before changing position, stand 30 minutes, and must walk around every 60 minutes for five minutes each time.  He indicated the claimant requires the ability to shift at will from sitting or standing/walking, and would sometimes need to lie down at unpredictable intervals during a work shift, once or twice per week.  Dr. Boeding indicated the claimant could occasionally twist, stoop (bend), climb stairs and ladders, and rotate the neck, and never crouch.  He indicated the claimant would be limited in reaching (including overhead), handling, fingering, feeling, pushing/pulling, and could handle and finger each only occasionally.  He noted the claimant should avoid concentrated exposure to extreme cold and heat, as well as vibration, and avoid moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.  He indicated she should avoid all exposure to hazards, noting she is unable to hear alarms.  He opined the claimant's impairments or treatment would cause her to be absent from work less than once per month.  He noted he had been treating the claimant since May 2013.

Tr. at 32.  The ALJ cited the following reasons for affording the opinion little weight:  1) the doctor's conclusions are "highly inconsistent with the overall medical record, course of care, and his own objective physical examination findings;" 2) Throughout his notes, the doctor indicated the claimant was able to move about the room without difficulty and had normal muscle tone; 3) the doctor relied quite heavily on the subjective report of symptoms and limitations provided by the claimant. Tr. at 32-33.  In support of her finding the ALJ cited evidence from the medical record which state Plaintiff's musculoskeletal examinations were normal with no gross deformities, normal muscle tone, with the ability to move about the examination room without difficulty.  Tr. at 33.

1) **August 28, 2017**.  This is a report of a preoperative history and physical.  Plaintiff was scheduled for a bilateral L4-4 TFE (transforaminal epidural steroid injection) and ONB[5] and TPI (trigger point injection) on August 29.  Tr. at 1726.  On musculoskeletal exam, it was noted that the extremities were normal, gait was normal, muscle tone was normal and Plaintiff was able to move about the exam room without difficulty. Tr. at 1730.  On Preoperative risk assessment, Plaintiff was rated at Class 2 – mild systemic disease, no acute problems, no functional limitations.  Tr. at 1731.

2) **October 9, 2017**, Plaintiff was seen for chronic upper and lower extremity pain.  Plaintiff had recently undergone bilateral L4-L5 TFE  but reported that it was not very helpful.  "[H]er primary pain is centralized in her LT wrist and hand, as well as continued headache pain."  Tr. at 2841.  On musculoskeletal examination, Plaintiff had normal muscle tone and was able to move about the exam room without difficulty.  The doctor ordered a repeat spinal cord stimulator trial from Boston Scientific.  Plaintiff's medications were refiled "as she continues to note relief without side effect.  Tr. at 2842.

3) **November 22, 2017,** Plaintiff reported that during a Boston Scientific spinal cord stimulator trial she had increased pain about which she discussed with the representative of the company.  Plaintiff was told that the actual implant should be more consistently providing relief.  Tr. at 2836.  On examination, the doctor noted that Plaintiff had normal muscle tone and was able to move about the exam room without difficulty.  Assessments were chronic pain, postlaminectomy syndrome, lumbar radiculopathy, and cervical radiculopathy.  Tr. at 2837.

4) **December 14, 2017**, (On this occasion Plaintiff was seen for follow up regarding chronic neck and low back pain as well as headaches.  Plaintiff was given an H-wave (electrical stimulation) device to relieve her neck pain.  Plaintiff was also scheduled for a spinal cord stimulator trial which was scheduled for December 19, 2017.  The doctor refilled Plaintiff's medications "as she continues to note relief without side effects").  Tr. at 2834.

The ALJ wrote that the doctor had relied on Plaintiff's subjective reports but that the ALJ had previously determined that there were good reasons for questioning the reliability of Plaintiff's subjective complaints.  The ALJ concluded: "Given these inconsistencies, and lack of objective findings to support the degree of restriction asserted in Dr. Boeding's report, his statement is given little weight in determining the residual functional capacity."  Tr. at 33.

PLAINTIFF'S ARGUMENT

Plaintiff argues that Dr. Boeding is the only treating or examining source to submit an opinion, no consultative examinations were ordered by the agency, and that the State agency opinions on the issue of Plaintiff's residual functional capacity were rendered before new

---

[5] The Court is unable to find the meaning of the acronym ONB.

evidence, including Dr. Boeding's opinion as well as 1500 pages of medical records, was

submitted.  ECF # 18 at 15.  Plaintiff argues that:

> … even if only some of the physical limitations assessed by Dr. Boeding were
> erroneously excluded from the RFC, remand is still required for a legally sufficient
> RFC to be crafted and vocational testimony taken regarding the import of the
> additional limitations on the occupational base.  *Draper*, 425 F.3d at 1130[6].

*Id*. at 16.

Plaintiff emphasizes no other examining physician offered an opinion on this question.

Plaintiff notes that Dr. Boeding is a pain management specialist, that that status was not

acknowledged by the ALJ.  *Id*. at 17.

Plaintiff notes that the ALJ stated that Dr. Boeding relied heavily on Plaintiff's subjective

reports.  Plaintiff asserts that this is "mere speculation without basis in the record."  Plaintiff

writes that while the doctor considered Plaintiff's reported symptoms, his opinion was rendered

through the lens of his professional expertise.  Plaintiff cites *Putnam v. Colvin*, 2014 WL 5320947

(W.D. MO. October 17, 2014) in which the Court wrote:

> The ALJ also discounted Dr. Click's opinion because he "apparently relied
> quite heavily on the subjective report of symptoms and limitations provided
> by the claimant, and seemed to uncritically accept as true most, if not all, of
> what the claimant reported." This conclusion is not supported by substantial
> evidence in the record. The ALJ pointed to no evidence in the record that
> shows Dr. Click relied "quite heavily" on Plaintiff's subjective complaints.
> This Court has previously remanded a case when the ALJ in that case made
> the same conclusion as the ALJ in this case without supporting the
> conclusion with evidence from the record. In *Bollmeyer v. Astrue,* 2011 WL
> 1769790 (W.D.Mo.2011), the ALJ discounted the opinions of two treating
> physicians by stating—in language identical to that used by the ALJ in this
> case—that the "doctors apparently relied quite heavily on the subjective
> report of symptoms and limitations provided by the claimant." *Id.* at * 8.
> This Court observed that it was unclear how the ALJ arrived at the

---

[6] The citation is to *Draper v. Barnhart*, 425 F3d 1127, 1130 (2005).  The Court of Appeals
noted that the ALJ's finding that Draper could not return to her past relevant work –
classified as "light" – was inconsistent with the finding that Draper retained the residual
functional capacity for a full range of light work.  The Court also took issue with the ALJ's
finding that Draper's allegations of disabling pain were inconsistent with her daily activities.

> conclusion that the treating physicians relied on the subjective report of the claimant. Rather than using boilerplate language, the ALJ was required to assess each treating physician's opinion individually with reference to the factors listed in 20 C.F.R. § 404.1527. *Id.* at *9. This case is no different. While the ALJ conducted a § 404.1527(c) analysis, the analysis was not supported by substantial evidence in the record, and the ALJ pointed to no evidence in the record to show Dr. Click's opinions were largely based on subjective complaints rather than Plaintiff's medical history and diagnoses and his treatment of her. Remand is necessary so that the ALJ may identify specific evidence to support his conclusions.

*Id*. at *4.  Plaintiff argues that the ALJ failed to cite any specific evidence supporting the conclusion that the doctor improperly relied on Plaintiff's subjective complaints rather than the medical history, diagnoses, and treatment.  ECF 18 at 19.

Plaintiff argues that contrary to the ALJ's finding, the medical record supports the opinion rendered by Dr. Boeding.  Plaintiff points to numerous medical records which show treatments for low back, neck, obesity, headaches, osteoarthritis in the thumbs, deQuervain's tenosynovitis, weakness in the left lower extremity with foot drop, and shoulder impingement.  ECF 18 at 19-24.  Treatment for these conditions included bilateral L5-S1 facet injections, steroid injections, pain management, hip injections, physical therapy, lumbar spine radiofrequency ablation, medication, bilateral occipital nerve blocks, a lumbar spinal cord stimulator, a cervical spinal cord stimulator.  *Id*.

Plaintiff argues that there is no reasonable basis to support the ALJ's finding that Dr. Boeding's opinion is inconsistent with the record.

### EVIDENCE NOT DISCUSSED BY THE ALJ

Plaintiff asserts that there is medical evidence in the record which was not considered by the ALJ.  ECF No. 18 p. 19.  Plaintiff first points to a record dated May 2013 showing L5-S1 facet injections to relieve back pain radiating into her hip.  On May 22, 2013 Plaintiff was seen by Brent Thomas Kapfer, APRN, CRNA at the request of a physician from the

Spine Center, for bilateral L5-S1 facet injections.  Tr. at 555.  Before the injections, Plaintiff

reported her pain as 5 out of 10.  After the procedure, pain was reported as 0 out of 10.  Tr. at

556.

On August 29, 2013, Plaintiff saw Kevin Ronald Chatwin, M.D.  Plaintiff reported

having taken seven steroids which had not significantly helped her pain.  Treatment

consisted of acupuncture.  Tr. at 587-88.

On May 5, 2014, Plaintiff saw Olutoyin Enitan Akintola, M.D.  Plaintiff had

previously undergone a laminectomy but was still having back pain and was seeking an

opinion of the role of surgery.  Plaintiff reported ongoing pain which had become worse in

the previous month and a half.  The pain was described as sharp and stabbing which radiated

into the right buttocks.  Tr. at 613.  Plaintiff was given a referral to orthopedics.  Tr. at 617.

On November 3, 2014, x-rays showed a mild reversal of the normal cervical lordosis

with degenerative disc disease at C5-6, and C6-7 with moderate loss of disc space height and

marginal osteophyte formation.  Tr. at 681.  Mild to moderate stenosis, cord deformity, and

foraminal stenosis at C5-C6 and C6-C7 were seen on August 25, 2016.  Tr. at 1088.  On

June 21, 2018 it was noted that the deformities seen in August 2016 were "slightly smaller."

At C6-C7, the central canal was mildly narrowed, and there was mild right and moderate left

foraminal stenosis due to an uncinate spur.  Tr. at 2611-12.

On May 18, 2015, Plaintiff saw Dr. Akintola for chronic back pain.  Plaintiff was

seeking a referral for pain management.  Tr. at 701.

On June 5, 2015, Plaintiff was telephoned to obtain an update regarding bilateral

trochanteric bursa injection that had taken place on May 29.  Tr. at 993.

On April 28, 2016, Plaintiff was seen for a physical therapy initial evaluation.

Plaintiff reported that she could walk "maybe 15 mins," sit for 30 minutes, and stand for 15-

30 minutes.  It was also noted that Plaintiff was employed part time at a McDonalds, a job

that required "lots of standing."  Tr. at 901.

On October 29, 2018, Plaintiff was seen by Mark Thurnbeck, OTR/L, CHT.  Plaintiff

reported some bilateral hand and arm numbness and tingling stemming from her neck (in

Plaintiff's brief the word "radiating" is used in place of "stemming".  Tr. at 3053.

Next Plaintiff cites numerous treatment records from Dr. Boeding.  Plaintiff writes:

"Dr. Boeding began treating Plaintiff in May 2013 and managed to help her lose 100 pounds

to reduce back pain.  Tr. 904-05; 1180."   Dr. Boeding's records are discussed in the order

cited by Plaintiff in her brief:

1) April 21, 2016, Plaintiff was seen to discuss progress since the last visit on March 3
   2016.  Tr. at 904-05.  Among other things, it was noted that Plaintiff had "continued
   to work part-time throughout these past few years."  She had quit smoking, weaned
   off narcotics, and was weaning off benzodiazepines.  Plaintiff had lost "over 50
   pounds of weight" in an attempt to relieve her low back and buttock pain.  Tr. at 905.
   Plaintiff was given injections at the points of maximal tenderness and she was
   discharged home.  Tr. at 906.
2) May 1, 2013, Plaintiff was seen for evaluation of chronic low back pain.  Plaintiff
   was working at McDonalds.  Plaintiff reported that "[h]er pain is mostly when she is
   at work, given that she has to stand the entire time…"  Tr. at 1180.
3) January 20, 2014, Dr. Boeding ordered "XR medial branch block lumbar.  Tr. at 416-
   17.
4) An MRI dated February 14, 2012, showed evidence of a previous left laminectomy at
   L5-S1 with recurrent disc bulge and osteophytic ridging resulting in moderate left
   forminal stenosis, no central stenosis.  The MRI also showed mild to moderate facet
   degeneration at L4-L5 but no disc herniation or stenosis.  Tr. at 1184-85.
5) September 14, 2015, Plaintiff underwent bilateral L3, 4, 5, SA (L5 is sacralized) RFA
   #2.  Tr. at 980.
6) September 14, 2015, as instructed, Plaintiff called the doctor's office to report that
   her pain had returned.  Tr. at 983.
7) May 29, 2015, Since the previous visit on May 12, 2014, Plaintiff had undergone
   bariatric surgery and lost 70 pounds.  Plaintiff reported that her pain was provoked by
   prolonged standing and walking.  Tr. at 999.
8) June 3, 2015, telephone encounter with Dr. Boeding.  The note discusses the doctor's
   thoughts regarding another RFA.  Tr. at 1002.
9) March 10, 2014, bilateral L3, 4,5, SA RAF #1.  Tr. at 1097-98.
10) See No. 7 above.
11) November 23, 2015, Plaintiff had painful and reduced LS range of motion and
    straight leg raise was positive on the right.  Plaintiff was given a left trochanteric

     bursa injection.  This examination and procedure was performed by Kyle Leigh Olson, PA-C at the same clinic where Dr. Boeding is located.  Tr. at 415.  See also Tr. at 955; 414.

12) November 6, 2015, Plaintiff called Dr. Boeding's clinic to request prescription medication for pain.  On November 9, in a telephone call Plaintiff reported pain in her low back, both hips, left leg and top of foot.  Tr. at 964.

13) December 8, 2015, MR of Plaintiff's lumbar spine showed interval slight progression of posterior facet degenerative changes and thickening of ligamentum flavum at L4-L5.  No central foraminal stenosis at this level, posterior changes at L5-S1 – progression of degenerative disc space narrowing at this level, but no central or right foraminal stenosis – mild to moderate left foraminal stenosis is unchanged.  Tr. at 419-20.

14) September 11, 2015, Dr. Boeding ordered and/or performed a radiofrequency ablation (although it appears that the procedure was ordered, the remainder of the record discusses an MR scan of Plaintiff's lumbar spine noted in #13 above.)  Tr. 418.

15) February 10, 2016.  Plaintiff saw John Thomas Mullen, Ph.D. for a pain management center evaluation.  The current pain management consisted of heat and rest.  Plaintiff reported her pain was somewhat better with light activity while distracted at work. Plaintiff sometimes used a back brace at work.  Plaintiff reported that she attended work regularly but any activity outside the workplace was limited.  Tr. at 931. Plaintiff was working 3-4 hours per day, 3-4 days per week.  Plaintiff reported that 2-3 times per month she may leave work early due to increased discomfort.  Tr. at 932.

16) December 9, 2015, Plaintiff's reported that after having an implant put in behind her ear, she was experiencing burning pain on the left side of her head, headaches, and pain that felt like a hammer is hitting her. Dr. Boeding telephoned Plaintiff and told her she could temporarily increase Topamax to 500 mg/day to help with burning pain.  Tr. at 950-51.

17) February 5, 2016, Plaintiff saw Dr. Boeding for low back and leg pain.  Tr. at 933. Plaintiff reported that a spine surgeon told her there was nothing else that could be done for her and she should return to the pain clinic.  Plaintiff's prescription for Topamax was temporarily increased for occipital neuralgia and for weight loss. Plaintiff was given injections in both hips and given an occipital nerve block.  It was noted that physical therapy could be deferred because Plaintiff was working full time and had previously completed a course of therapy.    Tr. at 936-37.

18) April 21, 2016, see # 1 above

19) April 5, 2016, in a phone encounter with a nurse at Dr. Boeding's clinic, Plaintiff was instructed to reduce the dosage of Topamax by 100 mg.  Dr. Boeding recommended a spinal cord stimulator.  Tr. at 915-16.

20) March 3, 2016, Dr. Boeding noted that Plaintiff continued to work full time.  Tr. at 922.  The doctor opined that Plaintiff would be a good candidate for a trial of a spinal cord stimulator.  Tr. at 924.

21) December 11, 2015 Plaintiff was working part time.  Plaintiff complained of headaches and pain status post cochlear implant, low back/buttock pain not improved post RFA.  Tr. at 947.  See also Tr. at 950 a telephone encounter dated December 7, 2015 in which Plaintiff reported that she was having burning pain on the left side of her head, headaches and pain that felt like a hammer.

22) April 21, 2016, See #1 above which dicusses the treatment record found at 904 & 905.  Plaintiff's brief states that on this occasion Dr. Boeding reported that she was using a spinal cord stimulator for chronic low back pain secondary to post-laminectomy syndrome (ECF No. 18, page 22).  In fact, the notation states that Plaintiff was interested in a stimulator and the doctor wrote that he would apply to Plaintiff's insurance for coverage.  Also at this visit, the doctor advised Plaintiff to cut back on Topamax and begin weaning the medication Lamotrigine.  The doctor wrote that he may add a medication such as Lyrica for low back and neck pain once the aforementioned medications were discontinued.  Repeat trochanteric bursa steroid injection were recommended as needed.  Tr. at 904.

23) On June 17, 2016, Plaintiff saw Dr. Akintola.  Tr. at 1922-27.  Plaintiff complained of bilateral foot pain and numbness, left worse than right.  Tr. at 1923.  On musculoskeletal examination there was joint pain in the ankle, muscle weakness and paresthesias in the ankle and foot.  Tr. at 1926.  On Neuro exam it was noted that Plaintiff had normal strength and tone, sensory exam was grossly normal with abnormal gait – "had mild foot drop on left foot."  Tr. at 1927.

24) On February 6, 2017, Plaintiff saw Dr. Boeding.  Tr. at 1444-46.  Plaintiff complained of chronic neck pain, migraines and bilateral hip pain.  The doctor wrote that Plaintiff was taking Lyrica with adequate pain relief without side effects.  An increased dosage had provided mild improvement in the nerve pain.  On examination, it was noted that Plaintiff had a normal gait and station, and she was able to sit comfortably.  No abnormalities were noted on neurological examination.  Tr. at 1444.  Plaintiff expressed interest in a cervical stimulator trial and the doctor ordered a trial.  Plaintiff was given occipital nerve blocks, and hip injections.  Tr. at 1445.

25) On January 9, 2017, Plaintiff saw Dr. Boeding.  Tr. at 1449-51.  The doctor noted the previous conversation about a spinal cord stimulator, but Plaintiff reported that she would like to postpone the trial.  Tr. at 1451.  This notation is contrary to Plaintiff's brief which, citing the same record, states that Plaintiff began the trial.  ECF No. 18 at 22.

26) Plaintiff cites several treatment notations for the proposition that Plaintiff complained of headaches, back and neck surgeries, numerous epidural injections, trigger point injection and lumbar spine injections, acupuncture and physical none of which provided relief.  ECDF No. 18, at 22.

   a) On February 3, 2014, Plaintiff saw Dr. Boeding at which time the doctor gave Plaintiff bilateral medial branch block at L3, L4 & L5 dorsal ramus #2.  Tr. at 1112.  On January 20, 2014, Plaintiff was seen for bilateral sacral lateral branch blocks. Tr. at 1115-17

   b) On October 4, 2013, Plaintiff saw Dr. Boeding.  Tr. at 1132-37.  Plaintiff reported she received short lived relief from the treatment provided when seen on September 16, 2013.  Plaintiff reported that her pain was worse with prolonged standing, and especially leaning over a counter, sink, or laundry.  Tr. at 1133.  On physical examination it was noted that Plaintiff's extremities were normal, her gait was normal, muscle tone was normal, and she was able to move about the exam room without difficulty.  Tr. at 1134-35.  Plaintiff was able to move all her extremities spontaneously with no apparent weakness.  Tr. at 1135.

   c) Plaintiff cites to page 1140 of the transcript on which is recorded a January 9 and January 10, 2014 summary of a telephone encounter regarding insurance

authorization.  This page also summarizes a telephone conversation on October 2, 2013.

d) On September 3, 2013, Plaintiff saw Kevin Ronald Chatwin, M.D.  Plaintiff had received relief for 24-48 hours after an acupuncture session but then her pain returned to baseline.  The doctor administered more acupuncture treatment.  Tr. at 1145.  The doctor also performed acupuncture on August 21 and August 29, 2013.  Tr. at 1146-47.

e) Plaintiff cites to pages 1150-51 of the transcript which shows that she underwent laparoscopic appendectomy on August 2, 2013 and was doing well post-surgery.

f) On February 6, 2017, Plaintiff saw Dr. Boeding complaining of chronic neck pain, migraines and bilateral hip pain.  On musculoskeletal examination, it was noted that Plaintiff's gait and station were normal, and she was able to sit comfortably.  Tr. at 1444.

g) On February 2, 2017, Plaintiff underwent cervical trigger point injections, cervical epidural steroid injection, and bilateral occipital nerve block.  Plaintiff tolerated the procedure and there were no complications.  Tr. at 1447.

h) On October 6, 2016, Dr. Boeding gave Plaintiff epidural steroid injection in her cervical spine.  Tr. at 2014-15.

i) On October 1, 2018 Plaintiff saw Dr. Boeding for chronic neck pain, headaches, shoulder pain, and low back pain.  Tr. at 2794.

j) On September 5, 2018 Plaintiff was seen for bilateral cervical and trapezius trigger point injections and for evaluation of chronic neck pain.  Injections on August 7 (Tr. at 2801) had provided minimal relief.  It was noted that Plaintiff was attending physical therapy for the neck and shoulder pain.  Tr. at 2798.

k) On June 20, 2018, Plaintiff was seen y Dr. Boeding for bilateral cervical trigger point injections.  Tr. at 2807.

l) On April 25, 2018, Plaintiff saw Dr. Boeding for follow-up evaluation of her neck and headache pain.  Tr. at 2812-14.  Plaintiff received trigger point injections.  Tr. at 2814.

m) On April 11, 2018, Dr. Boeding performed bilateral cervical medial branch blocks at the C3-C4, C4-C5, and C5-C6 facet levels.  Tr. at 2816.

n) On March 28, 2018, Dr. Boeding performed bilateral cervical paraspinal, trapezius, levator scapulae, and rhomboid trigger point injections.  Tr. at 2821.

o) On September 19, 2017, Dr. Boeding performed bilateral lumbar transforminal epidural steroid injection at L4-L5 levels.  On August 29. 2017, Dr. Boeding gave Plaintiff cervical epidural injection.  Tr. at 2844-45.

27) On March 20, 2017, Dr. Boeding performed a Thoracic access and cervical placement of spinal cord stimulator trial leads.  Tr. at 1493.  On March 24, 2017, Dr. Boeding pulled the leads "as pt declined any additional reprogramming to adjust for the discomfort/paresthesias."  Tr. at 2849.

28) On August 29, 2017, Dr. Boeding gave Plaintiff occipital nerve block and right cervical trapezius rigger point injections.  Tr. at 1731.

29) On November 13, 2017, Dr. Boeding implanted a spinal cord stimulator in Plaintiff's cervical spine.  Tr. at 2839.

30) On December 19, 2017, Dr. Boeding place thoracic spinal cord stimulator at T7.  Tr. at 1761 & 2832.

31) On December 11, 2018, Dr. Boeding inserted a stimulator into pls dorsal column.  Tr. at 1844.

Next, Plaintiff summarizes the medical records which document treatment for thumb

impairment:

1) On October 1, 2015, Plaintiff saw Dr. Akintola for an emergency room follow up. Plaintiff had been seen for right sided chest pain.  The emergency room work up was "essentially negative."  Tr. at 737.  Plaintiff cites to page 735 which lists bilateral thumb pain as the second diagnosis – after chest wall pain.

2) On October 7, 2015, Plaintiff saw Sarah Kinsella, M.D. for bilateral thumb pain.  Tr. at 744.  On examination the doctor noted tenderness in the thumbs.  There was full and symmetric active and passive range of motion of the forearm, wrist and digits bilaterally.  Strength was 5/5 in the muscles of the hand, wrist and forearm bilaterally.  Tr. at 746.  X-rays showed modest degenerative changes in the first carpal-metacarpal joint, but no other abnormalities were noted.  Plaintiff was not interested in conservative treatment and asked for a referral to an orthopedic surgeon. Tr. at 747.

3) On December 22, 2015, Plaintiff was seen by Jaclyn Bailey, M.D. Tr. at 874-76. Plaintiff's chief complaint was left greater than right thumb pain.  Plaintiff reported having been to hand therapy and that she had some opponens splints which did not provide significant relief.  Plaintiff had a paraffin was bath but was not using it. Plaintiff described intermittent numbness and tingling affecting both hands, but it was not localized to a specific nerve distribution area.  Tr. at 874.  On examination Plaintiff had some tenderness to palpation at the CMC joints, and some tenderness to palpation over the MP joint.  There was a positive Durkin and Phalen carpal compression test, but the remainder of the examination was normal. X-rays showed Eaton state II degenerative changes, (i.e. slight carpometacarpal joint space narrowing, sclerosis, and cystic changes with osteophytes or loose bodies less than 2 mm (*U.S. National Library of Medicine National Institutes of Health*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5085928/)).  Diagnoses were bilateral CMC joints primary osteoarthritis, and right carpal tunnel syndrome.  Tr. at 875.  Dr. Bailey provided Plaintiff a referral to hand therapy to re-learn tip to tip pinch.  The doctor noted that conservative treatment option had not been exhausted including nerve gliding activities and the use of a cockup wrist splint.  Tr. at 876

4) On October 23, 2015, Plaintiff told Glenn W. Ciegler, M.D., that 7 years before she had injections but over the previous year, the pain had increased.  It was noted that Plaintiff was working at McDonalds.  Tr. at 883.  X-rays showed moderate CMC arthrosis with mild deformity.  Tr. at 884.

5) On March 1, 2016, Plaintiff underwent an MRI of her right wrist.  Tr. at 814.  The study showed: first carpomentacarpal joint degenerative arthrosis with marginal spurring; and, capitate nonspeciltic cyst or intraosseous ganglion along the volar margin of the bone.  The radiologist wrote:  Marrow signal within the carpus otherwise appears within normal limits."  Tr. at 815.

6) On March 22, 2016, Plaintiff saw Dr. Bailey.  Tr. at 838-44.  Plaintiff was quite tender over her right thumb.  After an examination, diagnoses included bilateral

thumb CMC joint osteoarthritis primary Eaton stage 2 symptoms refractory to therapy modalities and corticosteroid injections; right greater than left deQuervain's tenosynovitis; possible right STT joints osteoarthritis. Tr. at 839. The doctor and Plaintiff discussed various treatment options and the doctor recommended a course of hand therapy and a splint which would be slightly different from the splints Plaintiff already had. Tr. at 839-40.

7) On March 1, 2016, Plaintiff received, from Dr. Bailey, injections to the bilateral thumb CMC joints. Tr. at 845-46.

8) On April 5 (Tr. at 833), and 7, 2016, Plaintiff was seen in physical therapy for treatment of right wrist deQuervain's tenosynovitis. Tr. at 831-32.

9) On January 11, 2016, Plaintiff saw hand therapist Mark L. Thurnbeck, OTRL, CHT. Tr. at 867-71. Plaintiff reported an 8 year history of thumb pain for which she had been treated with cortisone injections, therapy, and splints. Plaintiff said that she was doing anything for symptom management other than not using her hands. Tr. at 868.

10) On March 31, 2016, Plaintiff was seen by hand therapist Danielle M. Firkus, OTRL. Tr. at 835-38. Goals included an increase of grip strength to carry/lift objectes, grasp light-moderate objects, 10 pounds in 6 weeks by 50 percent short-term improvement in 12 weeks by 75 percent long term improvement. Tr. at 837.

11) On June 8, 2018, Plaintiff underwent right thumb CMC arthroplasty[7]. Tr. at 3022-23.

12) On August 30, 2018, Plaintiff saw Mark Thurnbeck, OTR/L, CHT on orders from her surgeon to begin strengthening. Plaintiff reported wearing splints for support and pain relief. The therapist noted that Plaintiff's motion seemed to be okay, but that she had significant weakness in grasp and prehension (the action of grasping or seizing) in the left hand. Tr. at 3037. The assessment was right thumb pain, thumb stiffness, thumb joint swelling and thumb joint weakness hand pain, hand swelling and hand weakness. Plaintiff range of motion was painful and limited. Strength, activities of daily living, gripping and lifting were all noted to be limited. The therapist porposed a plan of short-term goals to be achieved in 2-4 weeks to decrease pain and edema and to increase range of motion. Long term goals to be achieved in 4 weeks included, among other things, to return to pre-injury activity levels and lifestyle. Tr. at 3038. Plaintiff was seen again by the therapist on September 10, 2018. Plaintiff was moderately tender with mild localized swelling on the right. Tr. at 3039. Treatment plan was to continue therapy as in the previous plan of care. Tr. at 3040.

13) On November 8, 2018, Therapist Thurnbeck noted that using a scale of 0-100, with 0 being completely independent and 100 being completely unable to perform daily tasks, Plaintiff had improved from 89 on her first visit to 48. Tr. at 3055. The therapist wrote that Plaintiff had achieved good mobility of thumb, and functional strength with minimal pain in the right hand and thumb. All goals having been met, Plaintiff was discharged from care. Tr. at 3056.

Finally, Plaintiff cites medical records relating to her shoulder impairment.

---

[7] 1. Creation of an artificial joint to correct advanced degenerative arthritis. 2. An operation to restore as far as possible the integrity and functional power of a joint. Stedmans Medical Dictionary 76210

1) On November 3, 2014, Plaintiff saw Taylor Anne Hastings, PA-C.  Tr. at 678-83. After a physical examination which included range of motion testing, strength testing, impingement testing (positive Neer, Hawkins, and empty can), and after a review of x-rays (Tr. at 679-81), Ms. Hastings recommended physical therapy along with a steroid injection.  Tr. at 681.

2) On October 1, 2015, Plaintiff saw Dr. Akintola with complaints of chest wall pain. Tr. at 735.  Plaintiff complained of pain in the right side of the neck, shoulder, chest and back.  The pain was characterized as sharp and achey.  The intensity of the pain was moderate, severe at night or at work.  Tr. at 736.  It was noted that while Plaintiff was in the emergency room, the "work-up" was essentially negative. Tr. at 737.  The doctor's diagnosis was chest wall pain for which prednisone was prescribed.  Tr. at 741.

3) On October 12, 2015, Plaintiff saw Ms. Hastings.  Tr. at 750-52.  Plaintiff reported ongoing right shoulder pain which was starting to radiate down the deltoid but not to the neck or head.  Plaintiff denied numbness or tingling in her hands.  Tr. at 751.  Ms Hastings gave Plaintiff a steroid injection and recommend that Plaintiff begin physical therapy immediately.  Tr. at 752.

Plaintiff concludes her argument by asserting that there is no reasonable basis in the record to support the ALJ's finding that Dr. Boeding's opinion is inconsistent with, and unsupported by, the record.  Plaintiff argues that the ALJ should have ordered a consultative examination, called a medical expert, remanded the case to the State agency, or contacted Dr. Boeding to obtain clarification of his opinions.  Plaintiff argues that the ALJ rejected Dr. Boeding's opinion without good reasons and relied on the opinion of the State Agency medical consultants who had based their opinions on an incomplete record.  Plaintiff argues that the remedy is a remand for further proceedings.  ECF #18, at 25-26.

## COMMISSIONER'S ARGUMENT

The Commissioner argues that Dr. Boeding's medical reports document objective findings which contradict his medical source statements.  The Commissioner points to the notations that Plaintiff was able to move about the exam room without difficulty.  The Commissioner notes that Plaintiff did not require an assistive device, and that the

radiographic studies, which show degenerative changes, do not show disabling impairments.

ECF 27 at 17.

The Commissioner cited five radiographic reports:

1) a report of a lumbar spine MR scan dated December 8, 2015 which showed a slight progression of facet degenerative changes at L4-L5, but no central or foraminal stenosis; and postoperative changes at L5-S1 with progression of degenerative disc space narrowing but with no central or right foraminal stenosis and with mild to moderate left foraminal stenosis.  Tr. at 420.
2) a report dated November 3, 2014, which showed mild reversal of the normal cervical lordosis with degenerative disc disease at C606, and C6-7 with moderate loss of disc space height and marginal osteophyte formation.  No evidence of acute fracture.  Tr. at 682.
3) an MRI dated February 14, 2012 showed evidence of previous left laminotomy at L5-S1 with recurrent disc bulge and osteophytic ridging result[ing] moderate left foraminal stenosis no central L4-L5 mild to moderate facet degenerative changes but no disc herniation or stenosis.  Patent right neural foramen.  Tr. at 1097.
4) a cervical MR cervical scan dated August 25, 2016 which showed C5-C6 degenerative changes with mild-to moderate central canal stenosis, mild cord deformity, and mild- to moderate right-sided foraminal stenosis.  At C6-C7 there were degenerative changes with associated central disc protrusion causing mild-to-moderate central canal stenosis, mild-to-moderate left-sided foraminal stenosis, and mild right-sided forminal stenosis.  Tr. at 1988.
5) A Cervical spine ME scan dated June 21, 2018 which showed multilevel degenerative change; right-sided disc osteophyte complex at C5-C6 which could affect the exiting right C6 nerve root; broad-based central disc osteophyte complex at C6-C7.  This is leading to mild Central stenosis at this level.

Tr. at 2612.

In reply to Plaintiff's contention that the doctor did not rely on Plaintiff's unsupported

complaints, the Commissioner points out that the form submitted by the doctor specifically

requested that he consider reported symptoms, and that the doctor indicated that his opinion

was based in part on Plaintiff's chronic pain complaints.  In support of this argument, the

Commissioner cites two cases:  *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999) and

*Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996).

In *Rankin*, the treating doctor testified that Rankin's inability to complete the

classroom portions of a ranch management program was evidence that he was unable to do

sedentary work.  Rankin, however, testified that it was the heavier portions of the program –
working with livestock – that he was unable to tolerate.  It was for that reason that the
doctor's opinion was not afforded deference.

In *Gaddis*, it was contended that the ALJ erred by improperly disregarding the
opinion of the treating psychiatrist.  The Court held, however, that the ALJ specifically
assigned the most weight to the doctor's opinion regarding the severity of Gaddis'
depression and anxiety.  The only thing discounted was a reference to "disabling tinnitus."
The Court wrote that the psychiatrist's characterization of Gaddis' mental impairments as
disabling was disputed by other medical evidence and the record as a whole.  Because many
of the doctor's conclusions were based on subjective complaints that the ALJ found wholly
credible, no error was found in the ALJ's findings.

The Commissioner points to Plaintiff's routine, conservative treatment which
adequately controlled her symptoms; to Plaintiff's activities of daily living including the
completion of a college degree, volunteering as a victim's abuse advocate, and working part
time in the college's administration office while she as a full-time student.  ECF # 27 at 18.

The Commissioner argues that Plaintiff points to medical evidence which was
considered by the ALJ and asks the Court to reweigh the evidence.  Here the Commissioner
cites *Johnson v. Astrue*, 627 F.3d 316, 319 (8th Cir. 2010) – the job of the court is not to
reweigh evidence, but to ensure that the Commissioner's final decision is supported by
substantial evidence on the record as a whole; and *Pearsall v. Massanari*, 274 F.3d 1211,
1219 (8th Cir. 2001) – it is the ALJ's role to resolve conflicts between the various treating,
examining, and non-examining physician's opinions.

DISCUSSION OF ISSUE II

In *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016), the court wrote:

Having concluded that the ALJ properly discounted Julin's credibility, we consider the ALJ's weighing of the medical opinions. A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008); *see also* 20 C.F.R. § 416.927. If the opinion is not given controlling weight, then the ALJ must review various factors to determine how much weight is appropriate. *See* 20 C.F.R. § 416.927(c). Opinions of treating physicians typically are entitled to at least substantial weight, but may be given limited weight if they are conclusory or inconsistent with the record. *Papesh v.Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015).

Because Plaintiff's applications for benefits were filed March 24, 2016, the regulations that apply to the evaluation of Dr. Boeding's opinion are 20 C.F.R. §§ 404.1527, 416.927. The regulation states that on questions of the nature and severity of the impairment(s), a treating physician's opinion will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. The ALJ, whose function it is to weigh the evidence, determined that the doctor's conclusions "are highly inconsistent with the overall medical record, course of care, and his own objective physical examinations findings." Tr. at 32. The regulation goes on to state that when a treating physician's opinion is not given controlling weight, the ALJ must apply factors listed below to determine how much weight is given to the opinion. Those factors include: length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability; consistency; specialization.

In the case at bar, the ALJ considered that Dr. Boeding is a treating provider with a longitudinal treating relationship with the claimant. The ALJ found, however that his conclusions are inconsistent with the overall medical record, course of care, and the doctor's own objective physical examination findings. The ALJ pointed to various medical exhibits to support that opinion. The ALJ noted that the doctor relied on Plaintiff's subjective

complaints which the ALJ found to be not credible. The ALJ wrote: "Given all these inconsistencies, and a lack of objective findings to support the degree of restriction asserted in Dr. Boeding's report, his statement is given little weight in determining the residual functional capacity." Tr. at 33.

The Court agrees with the Commissioner that the ALJ properly considered the opinion rendered by Dr. Boeding and gave that opinion appropriate weight. As the Commissioner rightly points out, it is not the function of this Court to try the case de novo. Rather, the Court must search the record to determine if the Commissioner final decision, i.e. the ALJ's decision, is supported by substantial evidence on the record as a whole, taking into account the substantial evidence that detracts therefrom. Having reviewed this record, paying special attention to the medical records cited by the parties, the Court finds no evidence which detracts from the ALJ's findings that Plaintiff suffers from severe impairments which prevent her from performing her past relevant work, but which leave her with the residual functional capacity for unskilled work at the sedentary exertional level. The Court finds no evidence which detracts from the ALJ assessment of Dr. Boeding's opinion. Likewise, the Court finds no substantial evidence in this record or error of law which would require reversal.

## CONCLUSION AND DECISION

The Court has considered the evidence that supports, as well as the evidence that detracts from, the decision made by the ALJ. After applying the balancing test noted in *Gavin*, 811 F.2d at 1199, and cases cited therein, this Court holds the final decision of the Commissioner is supported by substantial evidence on the record as a whole and not affected by any error of law that requires reversal or remand. Plaintiff's Motion for Summary Judgment (ECF No. 17) is DENIED and Defendant's Motion for Summary Judgment (ECF

No. 26) is GRANTED.  The final decision of the Commissioner is affirmed, and the case is

dismissed.  The Clerk of Court shall enter judgment accordingly.

IT IS SO ORDERED.

Dated this ___15th___ day of October 2020.

_____
ROBERT W. PRATT, Judge
U.S. DISTRICT COURT